UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

HYACINTH L.,[1]

                    Plaintiff,

v.                                                    ACTION NO. 2:20cv641

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

UNITED STATES MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Hyacinth L. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3),

seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security

Administration ("SSA") denying her claim for disability and supplemental security income

benefits under Titles II and XVI, respectively, of the Social Security Act.

An order of reference assigned this matter to the undersigned.  ECF No. 15.  Pursuant to

the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure,

and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF

No. 19) be **DENIED**, and the Commissioner's cross motion for summary judgment (ECF No. 22)

be **GRANTED**.

## I.      PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits on August 4, 2017, alleging disability

beginning June 1, 2016, due to left-eye blindness, clinical depression, hypertension, upper

---

[1]  In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name
has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S.,
Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

respiratory infection, sinus infection, cold symptoms, and tendinitis in both shoulders.[2]  R. 165–68, 172–76, 216.

After denial of the claim both initially, R. 71–94, and on reconsideration, R. 97–116, plaintiff requested a hearing before an administrative law judge ("ALJ"), R. 146–47.  ALJ Jarrod Tranguch heard the matter on November 19, 2019, R. 32–70, and issued a decision denying benefits on February 5, 2020, R. 9–29.  On October 21, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–6.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Plaintiff filed a complaint on December 23, 2020.  ECF No. 1.  The Commissioner answered on July 12, 2021. ECF No. 14.  The parties filed motions for summary judgment, with supporting memoranda, on October 12 and November 12, 2021, respectively.  ECF Nos. 19–20, 22–23. Plaintiff filed a reply brief on December 3, 2021. ECF No. 24.  Plaintiff also filed a waiver of oral argument on October 12, 2021.  ECF No. 21.

As oral argument is unnecessary, the case is deemed submitted for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Plaintiff's Hearing Testimony, Function Report, and Disability Reports

#### 1.    Plaintiff's Hearing Testimony

At the time of the November 19, 2019 hearing before the ALJ, plaintiff was 54 years old, unmarried, and resided with her son, his fiancé, and her granddaughter.  R. 42–43.  Plaintiff's educational background includes one semester of college after completing high school.  R. 44.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

2

Plaintiff last worked on June 10, 2016, as a customer service specialist and office manager, and before that, as a senior sales associate. R. 44–45, 189–92, 194–98, 206. Plaintiff also had been self-employed as a part-time cleaner. R. 45, 192–94, 206.

Plaintiff stopped working on after her left eye developed infections and inflammation that would eventually result in complete left-eye blindness. R. 47–49. In 2019, plaintiff's right-eye vision worsened such that, even after two new glasses prescriptions, "things are a little blurry . . . at a distance." R. 49. Plaintiff's depth perception is thus impaired such that she "often" under or oversteps on stairs, causing her to lose her balance and fall. R. 61. Therefore, she must be careful every day when walking, though physical therapy has helped with her balance. *Id.*

Plaintiff also has lower back and shoulder pain, which collectively limit her ability to reach, lift her arms, and carry objects. R. 49–54. She describes her back pain as constant, and throbbing or sharp. R. 53–54. Sitting or standing too long can make this pain worse, as can lifting things. R. 54. Her shoulder pain, which developed in the year before the hearing, is worse in her right shoulder and in the mornings, and can significantly limit plaintiff's arm mobility. R. 50–51. When experiencing shoulder pain, plaintiff can, at most, lift about five pounds. R. 51–52. Otherwise, she can carry about eight pounds, although she cannot carry or hold such weight for long. *Id.* Pain precludes raising her arms above her shoulders, but she can reach straight and to her sides. R. 53. Plaintiff takes two drugs, Flexeril and Methocarbamol, for pain, and attends physical therapy for her shoulders. R. 51. She also received anti-inflammatory injections for her shoulders, which at first "helped a lot, [although] the second set [of shots] didn't help that for long." R. 56.

Plaintiff also developed knee pain, with her right knee being worse, for which she takes Tylenol XR.[3] R. 54–57. Plaintiff has not had any surgery for her shoulders, back, or knees,

---

[3] Plaintiff's full list of medications include: Amlodipine and Benazepril, for blood pressure;

although she was supposed to have surgery for a torn meniscus in her right knee. R. 56.

Combined, these conditions limit plaintiff's ability to stand and walk. R. 56–57. She can stand for an hour, although she cannot stand still and often rocks. *Id.* Plaintiff estimates she can walk "at least" two or three blocks before needing a break, and that she can sit for about an hour before needing to stand or change positions, "depending on her back." R. 57. She also relies on family for transportation to get groceries and to do similar errands, although she has used medical transportation for doctor's visits. R. 43.

Further, plaintiff testified that unspecified pain caused her to lay down almost all day when she first left work in 2016. R. 60–61. She also claimed she was "doing a lot of falling back then" due to balance and peripheral vision problems. *Id.* In 2019, she still rested "at least, three, four times for about an hour or so" between 9:00 a.m. and 5:00 p.m. R. 59–60.

On a typical day, plaintiff spends time reading, praying, talking to family, watching movies, and sometimes making quick meals or sewing. R. 57–58. Plaintiff has no issues with managing her personal hygiene and can do certain household chores like meal preparation, vacuuming, and loading the dishwasher, but has difficulty with mopping and dusting. *Id.* Plaintiff is also active in her church, although she does not currently do volunteer work. R. 59.

### 2.    Plaintiff's Function Report

Plaintiff's September 15, 2017 function report describes similar, but milder, limitations. R. 233–42. It reports plaintiff's difficulty with lifting, squatting, reaching, kneeling, bending and stooping for long periods, and seeing, and pain in her left eye and both shoulders. R. 236, 240. She has a "chip floating in [her] left knee and a torn meniscus on [her] right knee." R. 242.

---

Flexeril and Methocarbamol, for muscle spasms; Levocetirizine, Triamcylolon cream, Bepreve, and Olopotadine drops, for allergies; Sertaline, for depression; and Tylenol XR, for arthritis. R. 284–86.

Although "reaching arm[']s length is okay," she cannot lift more than ten pounds without aggravating her shoulder pain. R. 240. She also reports anxiety and fear of losing her sight and of becoming sicker due to a hepatitis C diagnosis. R. 241. Plaintiff was not sure how far she could walk before needing to rest, though she reported she would only need a minute of rest before continuing to walk. R. 240. Notably, plaintiff did not check the boxes to indicate that her condition limited her ability to walk, climb stairs, sit, bend, use her hands, stand, talk, understand, remember, follow instructions, complete tasks, get along with others, hear, or concentrate. *Id.*

Plaintiff reported mostly the same information about daily activities as in her hearing testimony, although the report is somewhat less restrictive. Specifically, she reports no problems handling basic personal care, making meals, eating, cleaning, watching TV, doing laundry, feeding a pet, taking medication, and checking blood pressure. R. 233, 236. She also reports sometimes needing help cleaning the house or doing laundry, and notes that cooking takes longer than it used to. R. 237. Plaintiff also said she visits or has visitors two or three times a month, although she needs someone to accompany her, and that these visits are less frequent than they used to be due to a lack of confidence. R. 239–40. Plaintiff notes she used to sew and exercise, and that she now reads only when she must. R. 239.

### 3.     Plaintiff's Disability Reports

Plaintiff also submitted three disability reports, dated August 22, 2017, R. 215–24, March 17, 2018, R. 244–52, and September 12, 2018, R. 267–74.

The first report largely confirms plaintiff's list of conditions, job history, and recent medical treatments. R. 215–24.

The second report, R. 244–52, records that around January 2018, plaintiff suffered "more abdominal pain and bloating, more depress[ion], [and that her] joint pain has worsened." R. 245.

Further, plaintiff reported as new conditions "pain in lower back and side[,] pain in joints on left side of body from shoulder to ankle and joint pain in shoulders knees and ankles[,] abdominal pain[,] nausea, nose bleeds[,] and toothache," as well as that she was "more depressed." *Id.* The report also notes additional treatment for respiratory infection, hypertension, depression, tendinitis, and hepatitis C.  R. 246–47.  Further, it notes plaintiff's decreasing daily activity, the impact of financial and transportation issues on filling prescriptions and keeping appointments, and concerns about finishing paperwork due to her failing memory.  R. 250–51.

The third report notes plaintiff's condition worsened around June 2018, with worse and constant joint pain, headaches, toothaches, constant nausea, skin mass rashes, and depression.  R. 268.  Additionally, plaintiff's sight had worsened such that she bumped into cabinets and walls daily and tripped and fell.  R. 272.  The report notes treatment from Dr. Javier for the "pain in the right abdomen and joint pain in shoulders, hands, knees, and ankles."  R. 270–71.

## B.    Hearing Testimony by the Vocational Expert

Tanja Hubacker, a vocational expert ("VE"), testified at the hearing.  R. 45–46, 62–69.  In response to the ALJ's first hypothetical,[4] VE Hubacker opined that a hypothetical person with

---

[4] The first hypothetical assumed a person with a similar age (54, an individual approaching advanced age), education (one semester of college), and work experience (customer service representative and senior sales associate) to the plaintiff and limited such a person to:  (1) light exertional level jobs; (2) lifting and carrying only 20 pounds occasionally, and 10 pounds frequently; (3) standing and/or walking for up to six hours total in an eight-hour workday; (4) sitting for up to six hours in an eight-hour workday; (5) occasionally pushing and/or pulling with the right upper extremities, such as operating a lever or hand control; (6) occasionally pushing and/or pulling with the lower extremities, such as operating pedals or foot controls; (7) occasionally balancing, stooping, crouching, using ramps and climbing stairs, but avoiding crawling, kneeling, or climbing up ladders, ropes or scaffolding; (8) having no visual acuity, depth perception, color, vision, or field of vision in the left eye, but having enough right eye visual acuity to frequently read small and large print, and having sufficient right eye depth perception and field of vision to handle objects of all sizes and avoid ordinary workplace hazards; (9) having sufficient color vision in the right eye to identify and extinguish [sic] colors; (10) avoiding wet or slippery conditions as well as unprotected heights or dangerous moving machinery; and (11) avoiding

plaintiff's limitations could perform plaintiff's past work as a customer service specialist, except for the requirement to carry a 50 pound box of paper from a vehicle to the office every two to three months. R. 65–66. She also testified that there were other jobs in the national economy that this individual could perform, including the light and unskilled positions of office helper, counter clerk, and non-postal mail clerk. R. 66. In response to the ALJ's second hypothetical,[5] VE Hubacker opined that both the plaintiff's previous position would remain appropriate as well as the other jobs mentioned, though she reduced the number of these other available positions by 50 percent. R. 67. In response to the ALJ's third hypothetical,[6] VE Hubacker opined that plaintiff's past work positions would remain available, although she was not asked about any other positions for a person with such limitations. *Id.* In response to the last hypothetical,[7] VE Hubacker opined these limitations precluded any work. R. 68.

## C.   Relevant Medical Record

The Court summarizes below the relevant medical records provided by the Commissioner. Because there is no disagreement about the state of plaintiff's eyesight, the Court does not discuss the details of specific treatments related to her eyes. The Court also limits or omits discussion of

---

occupations that require driving. R. 64–65.

[5] For the second hypothetical, the ALJ also limited such a person to: (1) standing and/or walking no more than four hours total in an eight-hour workday; (2) standing no more than one hour at a time; (3) walking no more than 15 minutes at a time; and (4) no overheard reaching and avoiding overhead work. R. 66–67.

[6] For the third hypothetical, the ALJ further limited such a person to: (1) sedentary work involving lifting and carrying no more than 10 pounds; and (2) standing and walking no more than two hours total in an eight-hour workday. R. 67.

[7] For the fourth hypothetical, the ALJ further limited such a person to: (1) needing to take additional unscheduled breaks during the workday to lie down; and (2) being off-task approximately 20 percent of the workday. R. 67–68.

tests or treatment for conditions unrelated to the Commissioner's decision, such as plaintiff's mammogram testing or her hepatitis C diagnosis. Further, the Court omits discussion of plaintiff's dental treatments, R. 290–97, as unrelated to plaintiff's eye infection, *see* R. 295–96, or other conditions relevant to the residual functional capacity ("RFC").

### 1.   Eye Treatments

Before and after the alleged onset date, plaintiff sought treatment at:  (1) Virginia Eye Consultants on 19 occasions in 2016, and once in 2017, R. 299–434, 575–81; (2)  Bon Secours DePaul Medical Center on July 15, 2016, R. 617–19; (3) Wagner Macula and Retina Center on July 26, 2019, R. 1160–73; and (4) Modern Eyes Optometry on five occasions in 2016, and twice in 2019, R. 564–73, 607–11.

Plaintiff was diagnosed with simple episcleritis, R. 564, episcleritis periodica fugax, R. 566–67, other chronic allergic conjunctivitis, chronic iridocyclitis of the left eye, R. 580–81, uveitis, nuclear sclerosis in her right eye, R. 1165, anterior scleritis of the left eye, R. 301, 568, purulent endophthalmitis of the left eye, R. 350, 401, 425, 428, 430, phthisis bulbi of the left eye, and a shrinking eye due to scar tissue, R. 428, 430, 434, 575, 580–81.  These were treated with NSAIDs, antibiotic injections, eye drops, corticosteroids, Percocet, and a vitrectomy.  R. 301, 350, 389, 391, 395, 399, 577, 580–81.  Plaintiff was advised to see a rheumatologist, R. 301, and have a primary care physician determine the cause of her severe pain, R. 331, 337.

While seeking treatment, plaintiff's left-eye visual acuity decreased from 20/20 in May 2016, R. 305, to 20/80 in early June 2016, R. 311, until it was reduced to light perception by late June, from which it never improved, R. 335, 347, 356, 364, 382, 388, 393, 399, 411, 416, 422, 579.  In August 2016, she was told her left-eye vision would likely never return.  R. 418.

## 2.   Treatment with Sentara Rheumatology Specialists

Plaintiff received treatment from this facility from August 29, 2016, through October 16, 2019. R. 438–66, 706–33, 1307–15. Although referred by Dr. Javier for her "very aggressive anterior uveitis" in her left eye, R. 465, plaintiff also was diagnosed with and received treatments for rotator tendinopathy/tendonitis and associated adhesive capsulitis, R. 457, 718, rotator cuff tendinitis and/or subacromial bursitis, R. 452, anterior scleritis of the left eye, chronic pain of the left knee, a rash, R. 711, 713, and undifferentiated connective tissue disease, R. 725–26. Beginning August 20, 2018, she also suffered from generalized pain in her shoulders, knees, ankles, and hands, with her hands and her left knee particularly bothering her. R. 711, 713. Her rheumatologist suspected that it was "just osteoarthritis," noting she had no synovitis or much tenderness in her hands on examination, and that the pain in her knees related to a patellar bone spur. R. 712–14.

On October 16, 2019, plaintiff complained of "moderately achy back discomfort," although at the same visit she also had a pain score of eight out of ten due to generalized pain. R. 1307, 1310. Plaintiff's rheumatologist diagnosed her with "garden variety" lumbago without sciatica, which he opined was "[p]erhaps related to [degenerative disc disease]/[degenerative joint disease] and/or muscle spasm," and for which he recommended core strengthening exercises, such as yoga, and prescribed a muscle relaxer. R. 1308. He also ordered a five-view, lumbosacral spine x-ray, and a follow up appointment in three months. R. 1308, 1313, 1315.

The x-rays taken that same day revealed "[m]ild grade 1 retrolisthesis of L3 and L4," although the alignment of plaintiff's spine was unremarkable and body heights were maintained, "[d]egenerative sclerosis noted along the inferior endplate of L4 and L5," endplate osteophytes, facet arthropathy, and "a mild narrowing at the L4-L5 disc space and severe narrowing of the L5-S1 disc space," with unremarkable soft tissue results. R. 1315. The final impression stated

"[d]egenerative changes as described above with mild grade 1 retrolisthesis of L3 on L4." *Id.*

Plaintiff received anti-inflammatory injections for her eyes and shoulders, which were sometimes helpful. R. 439, 457, 707. She was also referred to a physical therapist for her shoulder, R. 452, an ophthalmologist for her eyes, R. 718, 726, and instructed to practice core strengthening exercises, such as yoga, for her back. R. 1307–08.

During her visits, plaintiff never displayed any acute synovitis, had a good range of motion in her shoulders and knees bilaterally, and appeared alert, oriented, and possessing an intact memory. R. 439, 452, 458, 462–63, 466, 708, 713–14, 720, 728, 1310. The only exception is on March 21, 2017, when "rotator signs on the right" were noted. R. 452.

### 3. Treatment with Sentara Family Medicine Physicians[8]

In 2016 and 2017, plaintiff had approximately nine appointments with her primary care physician, Rosa Javier, M.D., of Sentara Family Medicine Physicians. R. 440–51, 454–56, 459–61, 468–70, 734–47. She treated plaintiff's ailments, including her eye condition, R. 468–69, 741, hepatitis C, R. 459–60, headaches and acute non-recurrent sinusitis/cold symptoms/acute upper respiratory infection, R. 443, 447, 454, chest pains without other noteworthy symptoms, possibly caused by a strained muscle, R. 448, essential hypertension, grief reaction, a hyperpigmented skin lesion, R. 443, throat issues presenting with transient odynophagia, dermatology issues, R. 734–35, neck mass, hives, epigastric pain, and menopausal symptoms, R. 741.

A CT scan of the neck mass showed no abnormal findings. R. 743, 825–26, 874–75. During these two years, plaintiff's memory, gait, range of motion, and muscle tone were normal, R. 445, 455, 450, 461. Treatment notes from March 28, 2017, also indicate plaintiff "[w]ould like

---

[8] Most, if not all, notes in the records from this facility were written or reviewed by Dr. Rosa Javier.

help in moving forward" and that she "[n]eeds to find employment." R. 449. Plaintiff was noted
to have depression/grief reaction and was referred to psychiatry, R. 448–49, without confusion, or
thoughts of self-injury or suicide. R. 449, 460.

On June 12, 2018, she sought treatment for a rash, abdominal pain, and back pain, with
both forms of pain having been consistent for several months, and right flank pain. R. 750. Her
back pain was achy, "worse with positions," and occasionally radiated to the posterior thigh and
the groin. *Id.*

On July 23, 2018, plaintiff sought further treatment for the rash and treatment for now
constant pain in her flank and in the joints of her hands and knees. R. 760–62. Specifically, her
left knee pain had worsened, although there was no clicking, locking, buckling, or creaking of the
left knee, and it was noted that surgery had been suggested a few years ago for a meniscal injury
in her right knee. R. 762. Her hand pain was also worse with movement, although there was no
morning stiffness, redness, swelling, tenderness, or deformity. R. 762, 764. Plaintiff had a normal
range of motion, although her left knee exhibited "swelling and effusion," with no tenderness or
bony tenderness. R. 764. Hand x-rays showed "very minimal degenerative changes," with no
"periarticular erosions," fractures, or dislocations that would suggest inflammatory arthropathy.
R. 828–29, 899–900. A knee x-ray suggested mild tricompartmental osteoarthritis, with no
fracture or dislocation and nothing remarkable about her soft tissues. R. 829–30, 900–01.

On September 18, 2018, during an otherwise unremarkable physical and gynecological
exam, plaintiff stated that pain affected her daily life, and was found positive for memory loss
issues in a review of systems. R. 767, 770. Her gait was normal with normal reflexes and motor
strength. R. 771.

One month later, on October 15, 2018, plaintiff sought treatment for breast pain, after a fall

that hurt her right breast. R. 776, 778. Plaintiff did not lose consciousness from her fall, did not hit her head, and was able to get up by herself. R. 778. Plaintiff said she fell what often, "about four times this year," due loss of vision. *Id.* Plaintiff's doctor referred her to physical therapy to address the falls, and ordered monitoring for the breast pain, suspecting that it was an acute injury. R. 777. Mammo-digital screenings showed no suspicious findings. R. 880, 886, 914–15.

Two months later, on December 24, 2018, plaintiff sought treatment for intermittent back pain that recently worsened, with dull and achy pain becoming sharp shooting pain into her right lower quadrant. R. 785–87. A physical exam showed tenderness along the right paraspinal musculature, and limitations in bending and side-to-side movement of the trunk. R. 790. However, plaintiff did not show any "vertebral body tenderness of the thoracic or lumbar spine." *Id.* She was again referred to physical therapy, although plaintiff reported not having heard back from physical therapists from the earlier referral. R. 786–87.

Plaintiff returned two months later on March 4, 2019, complaining that she had fallen two more times since her last visit. R. 800–01. Due to plaintiff's "recurrent falls from loss of vision in L eye (enucleated)," she was again referred for physical therapy, which she had not previously attended due to cost issues. R. 802. Plaintiff sought and received a psychological referral after being diagnosed with a history of domestic violence, depression of an unspecified type, and adjustment disorder with mixed anxiety and depressed mood. R. 800–02. She was also diagnosed with hyperpigmentation, and was referred for treatment with a dermatologist. *Id.*

Plaintiff's last recorded visit to Dr. Javier was on June 4, 2019, following completion of physical therapy. R. 808–09. Plaintiff stated that physical therapy had improved her balance, and that she had had no new falls since physical therapy began. R. 809–10. Plaintiff was trying to eat better, stay physically active, and remain positive. R. 810. She scheduled a three-month checkup

on her chronic conditions with Dr. Javier. *Id.*

### 4. Treatment with Sentara Therapy Center

Plaintiff received physical therapy services from April 1 to June 3, 2019. R. 1238–1305. Her admitting diagnosis was "other abnormalities gait," which was also labeled a "balance disorder," and "repeated falls," with problems listed as "balance, ADLs, [g]ait abnormality, [and] [e]ndurance." R. 1239–41. Her prognosis was good, despite the listed barriers of "[c]o-morbidities, [b]ehavior, and [s]ocial history," with a general assessment noting difficulty with "performing tasks without visual support" and the need to focus her treatment to compensate for "decreased vision/binocular vision." R. 1241. Plaintiff reported particular difficulty ambulating outside, and difficulty telling when surfaces were "unlevel," leading her to often trip on uneven sidewalks or floors, even when careful. R. 1242. She noted that these issues interfered with engaging in hobbies and normal chores. R. 1243. However, her clinical presentation was "stable/uncomplicated" and her case classified as "low complexity." R. 1244.

Her functionality was assessed as being "independent with limitations," with functional limits around "ADLs/household chores, [w]alking, [b]athing, [and] [r]eaching." R. 1243. She was scored on three assessments. On the FOTO[9] assessment tool, she scored a 62, five points higher than like patients nationally at intake. R. 1272–74. On the FGA,[10] she scored a 21/30, with full points for casual walking and speed changes, but had severe issues with tandem walking and mild

---

[9] FOTO measures physical functioning status or ability through patient self-reporting. *Frequently Asked Questions*, FOTO Patient Outcomes, https://fotoinc.com/frequently-asked-questions/ (last visited April 29, 2022).

[10] The "Functional Gait Assessment," a test that scores ten walking abilities, including changing speed, turning, and stepping over obstacles, on a 0 to 3 point scale, with a 0 indicating a severe impediment, and a 3 representing normal ambulation. *Functional Gait Assessment*, Shirley Ryan Abilitylab (November 9, 2016) https://www.sralab.org/rehabilitation-measures/functional-gait-assessment (last visited April 29, 2022).

issues with all other tested areas. R. 1243. She received a 21/28 on the Mini BESTest[11] where she showed severe issues in walking up an incline with her eyes closed, and moderate issues with walking with her head turned, stepping over obstacles, standing on one leg, and compensatory stepping correction by moving backwards or laterally. *Id.* Plaintiff exhibited normal scores for standing up, rising to her toes, compensatory stepping corrections when moving forward, maintaining her stance with her feet together on firm and foam surfaces, changing her walking speed, walking with pivot turns, and a "timed up & go with dual task – 3 meter walk." *Id.* Plaintiff denied having any pain. *Id.* She also was not noted to be using any ambulation assistive device. R. 1244. Plaintiff did report that her ability to walk one block and climb one flight of stairs was "[n]ot [l]imited [a]t [a]ll"; that her ability to walk several blocks, lift or carry items like groceries, and bend, kneel, and stoop was "[l]imited [a] [l]ittle"; and that her ability to walk more than one mile or climb several flights of stairs was "[l]imited [a] [l]ot." R. 1272, 1300.

The goals of plaintiff's treatment were: (1) an FGA score of 25/30; (2) a Mini BESTest score of 25/28; (3) a seven point improvement on FOTO functional status; (4) that she would be able to independently do an at-home exercise program; and, (5) that, after three to six months, she would demonstrate her independent ability to keep up her training and functioning. R. 1242. Her treatment was to consist of once per week visits for three weeks, and then biweekly visits for the next six weeks, using "hot/cold modality" as well as "balance/weight bearing training, neuromuscular re-education, home exercise program, therapeutic activities, [and] therapeutic

---

[11] The Mini BESTest is a balance test that measures 14 balance-related items, grouped into four categories (anticipatory, reactive postural control, sensory orientation, and dynamic gait), on a 0 to 2 point scale, with a 0 indicating severe impediments, and a 2 indicating normal balance. *Mini Balance Evaluation Systems Test*, Shirley Ryan Abilitylab (June 4, 2013) https://www.sralab.org/rehabilitation-measures/mini-balance-evaluation-systems-test (last visited April 29, 2022).

exercise" interventions. *Id.* She was expected to only need supervision while walking, although a gait belt was recommended, as was educating her and her family on falling. R. 1244.

Plaintiff's actual treatment sessions ran between April 8 and June 3, 2019. During this time, plaintiff mostly completed her exercises without issue, other than mild knee discomfort or pain and feeling fatigued. R. 1260–61, 1268–69, 1275–76. During exercises, plaintiff needed intermittent upper extremity support, and cues to avoid rushing, excessive patellar translation, and forward gaze, as well as balance recovery for single leg stands. R. 1261, 1264–65, 1268–69, 1276. Plaintiff initially did not report any pain other than that caused by a sprained toe, R., 1264, although later she reported serious aching pain at a seven out of ten, R. 1275, which may have been related to her abscessed tooth and related antibiotic treatment in early May 2019, R. 1282–83.

On May 20, 2019, plaintiff reported having several "near falls" due to her knees locking, although she caught herself. R. 1282–83. However, that day she achieved all her short-term goals and two of her long-term goals, including a FOTO score four points higher than her initial goal. R. 1282–84, 1300.

Two weeks later, plaintiff achieved all of her short and long-term goals, although she also reported suffering from a pain ranging from zero to seven out of ten. R. 1294–95. Plaintiff also achieved a 26/28 score on the Mini BESTest, with only moderate issues noted in lateral compensatory stepping corrections and walking on inclines with her eyes closed. R. 1295–96. However, her FOTO score declined to 60, which was 2 points worse than her score at her intake session on April 1, 2019. R. 1303. Further, plaintiff now reported that her ability to walk one block, walk several blocks, and climb even one flight of stairs was "[l]imited [a] [l]ittle." *Id.* That said, her "Abilities Balance Confidence" scale increased from 41.7% on average at intake to 65.0% on May 20, 2019, and to 66.7% on June 3, 2019. R. 1304.

5.     **Treatment with Sentara Princess Anne Hospital**

Between April 21 and June 13, 2016, plaintiff sought treatment from Sentara Princess Anne

Hospital's emergency department for eye pain, and was diagnosed with iritis and uveitis, which

became chronic. R. 923–25, 998–1000. She also sought treatment for headaches, which were

diagnosed as simple tension headaches after a "very re-assuring" neurological exam. R. 998, 1000.

She had no myalgias, back pain, or arthralgias. R. 927. Plaintiff was not noted as needing

assistance walking, though she once "was discharged via stretcher." R. 999. Shortly thereafter,

plaintiff had an echocardiogram, which showed an ejection fraction of 55 percent and only one

abnormal findings of a mild thickening of the leaflet tips in the mitral valve. R. 852–54.

On October 1, 2018, plaintiff sought treatment after she fell on her right knee and hit her

right breast on a cupboard door. R. 1028, 1031. She did not suffer any head injury or lose

consciousness. R. 1031. Plaintiff had pain with movement in her right shoulder and hip with a

pain score of seven out of ten when active, and five out of ten when at rest. R. 1029. An

examination found a "deformity" and "tender[ness] to palpitation around the rotator cuff," but she

had the full range of motion of her shoulder, elbow, and wrist. R. 1032. She also had the full

range of motion of her right hip, with no signs of internal rotation or leg length discrepancy. *Id.*

Her right knee "show[ed] no effusion and no laxity" and she had a normal gait. *Id.* A review of

medical records and nursing notes, along with x-rays of her ribs, shoulder, and knee, found that

her chest and ribs were unremarkable, that her shoulder had "[c]hronic degenerative changes

without acute or aggressive osseous lesions" and that her knee had "[n]o acute osseous injury,"

but did evidence "chronic osteoarthritic changes." R. 1033, 1036–37, 1052–53. Plaintiff was

given medication, told to follow up with her PCP, and left walking with a pain score of one out of

ten. R. 1028–29. Her final diagnoses were contusions of the right breast, right knee, and right

shoulder. R. 1055.

On May 9, 2019, plaintiff sought treatment for an abscessed tooth and cavities. R. 1184–86, 1189, 1213.

### 6.   Opinion Evidence from State Agency Doctors

#### a.   Mental Limitation Evaluation by Dr. Dougherty

As part of the initial assessment of plaintiff's disability claims, Dr. Dougherty reviewed plaintiff's medical records through September 2017, and opined that plaintiff's depression, bipolar, and related disorders were non-severe. R. 71–76, 83–88. Dr. Dougherty also opined that plaintiff's symptoms did not "precisely satisfy" the 'A' criteria of the listings, only showed a mild limitation on concentration, persistence, or maintaining pace under the 'B' criteria, and showed no evidence of any 'C' criteria. R. 76, 87–88.

#### b.   Physical Limitation Evaluation by Dr. McGuffin

Following a review of plaintiff's medical records through September 2017, Dr. McGuffin opined that plaintiff had limitations caused by tendinitis of the right rotator cuff, and advanced, lower lumbar, intervertebral disc degeneration with facet arthrosis.[12] R. 77–82, 89–92. However, he opined these limitations were not as severe as plaintiff stated. R. 77, 89. Specifically, he noted findings of normal right eye vision, good range of motion in her shoulders and knees bilaterally, and plaintiff's statements and reports of daily activities. *Id.* He opined that plaintiff could do light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing or walking for six hours in an eight-hour workday, sitting for six hours in an eight-hour workday, and

---

[12] This finding comes from a CT scan performed at Virginia Beach General Hospital on November 15, 2015, performed due to plaintiff having lower left quadrant pain and nausea. R. 482–86. The CT scan found "advanced lower lumbar intervertebral disc degeneration with facet arthrosis," noted under the "Superficial Soft Tissues and Bones" findings. The impression section noted that there were no acute findings. R. 520–22.

a limited ability to use her right upper extremities to push or pull controls.  R. 78, 90.  He opined that plaintiff could frequently climb stairs, and occasionally climb ladders, ropes, or scaffolds, but had no other postural, including balance, limitations.  R. 78–79, 90–91.  Finally, he opined plaintiff should avoid concentrated exposure to hazards.  R. 80, 92.

   c.    **Reconsideration by Dr. Spetzler**

On reconsideration, Dr. Spetzler opined that plaintiff's conditions, including visual disturbances, major joint dysfunction, essential hypertension, respiratory disorder, esophagus disease, and depression were non-severe.  R. 104.  However, this opinion was based on the need for updated daily activity and medical reports, which were not provided despite multiple requests for them, and not based on any new information or evaluation.  R. 101–05.

   7.    **Opinion Evidence from Dr. Pithwa of Modern Eyes Optometry**

Plaintiff submitted a two-page "Medical Evaluation Report" from Dr. Neal Pithwa dated November 4, 2019, relating to treatment from April 25, 2016, through October 22, 2019.  R. 1174–75.  It states that plaintiff's impairments are that she is monocular and has permanent left eye blindness.  *Id.*  Dr. Pithwa claimed that plaintiff meets an "[i]mpairments, [s]pecial [s]enses and [s]peech" listing category.  R. 1174.  However, he did not specify the pertinent listing, despite being requested to do so, and instead noted that "loss of vision has only been three years; As a result [plaintiff] is still not comfortable adjusting to depth perception distances as a person with binocular vision."  *Id.*  He also opined that plaintiff has moderate functional limitations around unprotected heights, moving machinery, and exposure to dust, fumes and gases, and mild limitations concerning reading and writing.  *Id.*

   8.    **Opinion Evidence from Dr. Javier of Sentara Family Medicine Physicians**

Plaintiff submitted a "Medical Evaluation Report" and a "Physical Capacities Assessment"

from Dr. Javier dated November 8, 2019. R. 1180–82. Dr. Javier summarized plaintiff's impairments as "polyarthralgias, visual loss," which she wrote are supported by "Rheumatology and Ophthalmology notes[,] labs, xrays reviewed (available on request)." R. 1180. She opined that these conditions cause pain and/or fatigue such that plaintiff could not focus or stay on task 75 percent of the day, would need extra rest breaks causing her to be off-task more than one hour in an eight-hour workday, and would need 15 days of bedrest in an average month. *Id.*

She further opined that plaintiff could not work full-time, though plaintiff could sit for four hours and stand for three hours in an eight-hour workday, and that she could occasionally lift items weighing up to 10 pounds. *Id.* She also noted that, while plaintiff can do simple grasping with both hands, she can neither push nor pull arm or leg controls, and that only plaintiff's right hand is capable of fine manipulation. *Id.* Further, she opined that plaintiff is totally restricted from working around unprotected heights, being around moving machinery, being exposed to marked changes in temperature and humidity, and being exposed to dust, fumes, and gases, and that these impairments will last over 12 months, with no noted prognosis for recovery. R. 1181–82.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[13] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3)

---

[13] To receive disability insurance benefits, an individual must qualify as insured under the Social Security Act, be under age 65, file an application, and be under a "disability." "Disability" is defined "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

had an impairment that meets or medically equals a condition within the SSA's listing of official

impairments; (4) had an impairment that prevents performance of any past relevant work in light

of her residual functional capacity; and (5) had an impairment that prevents engaging in any

substantial gainful employment. R. 12–24.

First, the ALJ found that plaintiff qualified as insured[14] under the Social Security Act

through December 31, 2021, and that she had not engaged in substantial gainful activity as of the

alleged onset date of disability, June 1, 2016. R. 14.

At steps two and three, the ALJ found that plaintiff's left eye blindness and uveitis,

degenerative joint disease of the right shoulder, degenerative disc disease of the lumbar spine,

osteoarthritis of the bilateral knees, and obesity constituted severe impairments. R. 15.[15] The ALJ

further determined that plaintiff's severe impairments, either singly or in combination, failed to

meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt.

P, App'x 1, as required for a finding of disability at step three. R. 15–16.

The ALJ next found that plaintiff possessed the RFC:

> to perform light work . . . except [she] would be limited to standing and/or walking
> for up to four total hours in an eight hour day. She would be able to stand for up to
> one hour at one time, and could walk for up to fifteen minutes at one time. [She]
> could occasionally push and/or pull with her right upper extremity, such as for
> operating a lever or hand controls. She could occasionally push and/or pull with
> her lower extremities, such as for operating pedals or foot controls. [She] could
> occasionally balance, stoop, crouch, use ramps, and climb stairs, but should avoid
> crawling, kneeling, and climbing on ladders, ropes, or scaffolds. [She] would be
> unable to reach overhead with the right upper extremity, and should avoid any
> overhead work. [She] would have no visual acuity, depth perception, color of

---

[14] To qualify for disability insurance benefits, an individual must also establish a disability that
commenced on or before the last day in which that individual met the insured status requirements
of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

[15] The ALJ also classified plaintiff's fibroid uterus, balance disorder, gait abnormality, and
abscessed tooth as non-severe impairments; because "[t]he evidence of record does not
demonstrate that these conditions cause any significant functional limitations that have lasted or
are expected to last 12 months or more." R. 15.

vision, or field of vision over her left eye.  However, [she] retains sufficient right eye visual acuity to frequently read small and large print.  She has sufficient right eye depth perception and field of vision to handle objects of all sizes and to avoid ordinary hazards in the workplace, such as boxes on the floor, open doors, or approaching people or vehicles.  She retains sufficient color of vision in the right eye to identify and distinguish colors.   [She] should avoid wet or slippery conditions, and should avoid workplace hazards, such as unprotected heights and dangerous moving machinery.  She should avoid occupations that would require driving as part of the occupation.

R. 16–17.

Although finding that plaintiff's impairments could be reasonably expected to cause the alleged symptoms, the ALJ found her statements about their intensity, persistence, and limiting effects not entirely consistent with the medical and other evidence of record.  R. 18 (discussing plaintiff's negative skull x-ray, normal echocardiogram results, lack of acute distress, normal range of motion without acute joint synovitis, normal strength and sensation, normal coordination, normal neurological examinations and memory, normal gait, Romberg signs being negative, and right eye visual acuity ranging from 20/20 to 20/50).  The ALJ also discussed in detail plaintiff's eye treatments and the relatively mild results of her diagnostic imaging, including her neck CT scan and x-rays of the hands, chest, knees, and spine.  R. 18–20.  Further, the ALJ discussed plaintiff's various conditions, including the palpable mass on her neck, the visual fields of her right eye being "full to hand motion," her minimal degenerative changes in her CMC joints bilaterally as well as her left thumb MCP joint, the lack of erosions in her hands to suggest inflammatory arthritis, the mild tricompartmental osteoarthritis of her left knee, the bone spur in her left patella superior pole, her degenerative changes in her right shoulder without acute or aggressive osseous lesions, the chronic osteoarthritic changes in her right knee, the tenderness in her right paraspinal muscles which limited her bending and side to side movement of her trunk, her tooth abscess, as

well as her physical therapy and the degenerative changes with mild grade 1 retrolisthesis of L3 on L4 in her spine. *Id.*

The ALJ also assessed the persuasiveness of the opinion evidence and state agency findings, based upon their support in, and consistency with, the record evidence. R. 20–22.

The ALJ found the opinion of the state agency physician, Dr. McGuffin, generally persuasive noting that it was consistent with, and supported by: (1) the overall medical evidence, diagnostic test results, and measurable findings on clinical examinations, as well as plaintiff's conservative treatment history; (2) plaintiff's reports of "some tenderness of the paraspinal muscles" with occasional positive rotator signs on the right; (3) plaintiff's other examination findings that were largely benign, including the lack of active synovitis, her normal strength and range of motion in her extremities, intact sensation, and normal gait; and (4) the findings from plaintiff's eye examinations given the significantly reduced left eye vision but retained vision in her right eye. R. 20–21. The ALJ added limitations after considering all the evidence, including plaintiff's subjective complaints and testimony at the hearing. R. 21.

The ALJ found the opinion of Dr. Dougherty, the state agency psychological examiner, to be persuasive. *Id.* Dr. Dougherty found plaintiff's only mental limitations to be a mild limitation with concentration, persistence, or maintaining pace, with no severe mental impairments noted. *Id.* The ALJ found this opinion to be persuasive, consistent with, and supported by the record evidence because of the absence of "any dedicated mental health treatment, and the lack of any serious, abnormal cognitive or psychiatric deficits on examinations," as well as plaintiff's overall alert and oriented presentment at her appointments, including an intact memory. *Id.*

Concerning Dr. Pithwa's opinion that plaintiff had "moderate restrictions on exposure to unprotected heights, moving machinery, and pulmonary irritants, and mild restrictions on reading

and writing," the ALJ found the opinion somewhat persuasive. *Id.* The ALJ noted that this opinion was generally consistent with, and supported by, the findings of physical examinations, including ophthalmologic findings about the "significantly reduced vision over her left eye" and retained acuity in her right, but noted that Dr. Pithwa's notes were "somewhat vague, and [do] not contain a full function-by-function analysis of [her] physical limitations." *Id.*

Finally, the ALJ found Dr. Javier's opinion to be not persuasive. R. 21–22. Dr. Javier opined that plaintiff had the following limitations: (1) needing "extra rest breaks during the work day"; (2) needing to be "absent from work fifteen days per month"; (3) being "limited to four hours of sitting, and three hours of standing or walking in an eight-hour day"; (4) being only able to occasionally carry and lift up to 10 pounds; (5) needing to avoid pushing and pulling with her arms; (6) avoiding "fine manipulations on the right";[16] (7) being "unable to use her bilateral lower extremities for pushing or pulling"; and (8) needing to "avoid unprotected heights, moving machinery, marked changes in temperature and humidity, and exposure to pulmonary irritants." R. 21 (citing R. 1180–82). The ALJ found this opinion was not supported by, or consistent with, the overall medical record evidence, including diagnostic test results and measurable findings on clinical examinations, specifically with the mostly normal physical examination findings, the findings of normal strength and sensation, the normal range of motion for her extremities, the lack of active joint synovitis, and her normal gait. R. 21–22.

---

[16] The ALJ appears to have misread Dr. Javier's opinion regarding limitations with plaintiff's hands. R. 21. While the ALJ reports Dr. Javier opined plaintiff "should avoid fine manipulation on the right," Dr. Javier's opinion actually indicates that plaintiff could do fine manipulation with the right hand, but not the left. R. 1181 (checking "yes" for fine manipulation of the right hand but "no" for the left, where the form asks what actions a patient can do). However, there is no apparent reason why confusing the hand indicated by Dr. Javier would matter in the ALJ's analysis, and therefore, this error is harmless.

Based on the credible opinions and overall medical evidence, the ALJ determined that plaintiff possessed the RFC noted above. The ALJ noted this RFC was consistent with the available medical evidence, including the paraspinal muscle sensitivity and "occasionally positive rotator signs on the right, but otherwise . . . benign examination findings." R. 22. These examination findings include plaintiff's lack of active synovitis, normal strength and range of motion, intact sensation, and normal gait. *Id.* The ALJ also did not credit plaintiff's hearing testimony that she suffered from issues with concentration, as there was no medical evidence to support this claim. *Id.*

At step four, the ALJ found that plaintiff's past relevant work, as a customer service representative and dispatcher, were within plaintiff's RFC. R. 22. Further, after considering the VE's testimony, as well as plaintiff's age, education, work experience, and RFC, the ALJ found plaintiff capable of successfully adjusting to other work, existing in significant numbers in the national economy, such as an office helper, counter clerk, and non-postal mail clerk. R. 23.

Therefore, the ALJ found that plaintiff was not disabled from June 1, 2016, through the date of decision, February 5, 2020. R. 24.

### IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of*

24

*N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.   ANALYSIS

A.   **The ALJ's assessment of Dr. Javier's opinion is supported by substantial evidence.**

Plaintiff seeks a remand on only one ground: that "the ALJ failed to properly evaluate the opinion evidence of Plaintiff's treating physician, Rosa M. Javier, M.D." Pl.'s Mem. Supp. Mot. Soc. Sec. Appeal ("Pl.'s Mem."), ECF No. 20, at 1, 6.  Plaintiff argues that the ALJ failed to provide a logical bridge to reject Dr. Javier's opinion,[17] mischaracterized and cherry-picked certain

---

[17] Although once stating that "[t]he ALJ provides a summary of evidence but fails to explain how that evidence equates to the RFC determination," plaintiff's objection is much narrower.  Pl.'s

record evidence that would otherwise support Dr. Javier's opinion, and failed to discuss the probative evidence concerning plaintiff's balance. *Id.* at 8–12.[18] Plaintiff argues these errors are not harmless because the VE opined that no work would be available in response to the hypothetical that accounted for the limitations noted in Dr. Javier's opinions, and thus the ALJ would have found plaintiff to be disabled. *Id.* at 12.

The Commissioner rejects plaintiff's assertions and argues that the ALJ properly found the opinion to not be persuasive by considering and reasonably articulating the most important factors for assessing opinion evidence, supportability and consistency. Mem. Supp. Def.'s Mot. Summ. J. Opp'n. Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 23, at 22.

In reply, plaintiff challenges the Commissioner's reading of the regulations concerning when an ALJ is required to offer written analysis of available evidence, and argues that the ALJ's articulation of the consistency and supportability factors was inadequate. Pl.'s Reply Def. Mot. Summ. J. ("Pl.'s Reply"), ECF No. 24, at 2. Additionally, plaintiff argues that the Commissioner offers improper post-hoc rationalizations "to create the logical bridge that . . . does not exist in the ALJ's decision." *Id.* at 2–3.

---

Mem. 9–10. Plaintiff repeatedly states that she is only questioning the ALJ's evaluation of Dr. Javier's opinion. Pl.'s Mem. 1, 6, 12. Accordingly, the Court limits its review to plaintiff's challenge to the RFC with respect to the alleged mistreatment of Dr. Javier's opinions.

[18] Plaintiff testified to having difficulty concentrating and non-severe problems with her memory. R. 55–56. This is somewhat supported by her September 15, 2017 function report. R. 236, 240 (noting that plaintiff cannot focus like she could before her illness, that she is unsure how long she can pay attention, that she does not always finish what she starts, and that she is "not as good" at following spoken instructions). However, the ALJ found "nothing in the medical evidence of record to support this allegation." R. 22. Plaintiff mentions difficulty concentrating as one of Dr. Javier's findings supporting plaintiff's need to be off task 75% of the workday. Pl.'s Mem. 6, 8. However, plaintiff does not specifically challenge the ALJ's treatment of the medical record on concentration like she does the ALJ's discussion of her spine or balance issues, *id.* at 10–12.

1. **The SSA's new methodology for considering medical opinions applies.**

The SSA revised its medical evidence rules for claims, such as plaintiff's, filed on or after

March 27, 2017.[19]  82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132

(Mar. 27, 2017) (correcting technical errors in final rule).  Under those rules, an ALJ must consider

and explain the persuasiveness of each medical opinion in the record.[20]  20 C.F.R. §§ 404.1520c(b),

416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content

of medical opinions and less on weighing treating relationships against each other").  In doing so,

an ALJ no longer need give controlling (or assign any other) weight to medical opinions.[21]  20

C.F.R. §§ 404.1520c(a), 416.920c(a).

In assessing persuasiveness, the ALJ's chief task is to decide whether the opinion or finding

is supported by and consistent with the record.  *Id.* §§ 404.1520c(b)(2), (c)(1)–(2), 416.920c(b)(2),

(c)(1)–(c)(2); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important

factors").  Supportability requires an ALJ to consider how "objective medical evidence and

---

[19] The revised regulations dispensed with the treating physician rule.  *See* 20 C.F.R.
§§ 404.1527(c)(2), 416.927(c)(2); *see also Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 255–
56 (4th Cir. 2017).  The SSA also rescinded Social Security Ruling ("SSR") 96-2p, 61 Fed. Reg.
34490, 34491 (July 2, 1996), discussing how to weigh treating source opinions.  82 Fed. Reg.
15263-01, at 15263 (Mar. 27, 2017) (noting that, for claims filed on or after March 27, 2017,
"adjudicators will not assign a weight, including controlling weight, to any medical opinion"); 82
Fed. Reg. 16869-02 (Apr. 6, 2017) (corrective notice noting recission effective date of March 27,
2017); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

[20] A "medical opinion" is a statement from a medical source about a claimant's limitations and
ability to perform physical, mental, and other work demands, and to adapt to a workplace
environment, in spite of her impairments.  20 C.F.R. §§ 404.1513(a)(2)(i)–(iv), 416.913(a)(2)(i).

[21] Opinions of state agency consultants, identified as "prior administrative medical findings," are
assessed using the same rubric.  20 C.F.R. §§ 404.1520c(a), 416.920c(a); *see* 82 Fed. Reg. 5844,
at 5853 (highlighting the "eliminat[ion of] confusion about a hierarchy of medical sources" and
greater focus upon the persuasiveness of any given opinion); 20 C.F.R. §§ 404.1513(a)(5),
416.913(a)(5) (defining "prior administrative medical finding[s]" as those rendered by federal or
state agency consultants).

supporting explanations presented by a medical source . . . support his or her medical opinions."
20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).   By comparison, consistency requires an ALJ to
determine how "consistent a medical opinion(s) . . . is with the evidence from other medical
sources and nonmedical sources . . . ." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).   The ALJ also
should consider a medical source's specialization, relationship with the claimant, and other factors
tending to support or contradict a particular opinion or finding.   *Id.* §§ 404.1520c(c)(3)–(5),
416.920c(c)(3)–(5).   However, an ALJ's explanation of these other factors is only required by the
rule when an ALJ concludes that two or more medical opinions are equally supported by, and
consistent with, the record.   *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3).   Further, although the ALJ
"should articulate how [she] consider[s] *medical opinions*" the "reasonable articulation standard .
. . does not require written analysis about how [the ALJ] considered each *piece of evidence*."   82
Fed. Reg. 5844-01, at 5858 (emphasis added).   In other words, although an ALJ must consider all
evidence, and must write an analysis explaining the supportability and consistency of record
evidence and any medical opinions, an ALJ need not explain how she reviewed every piece of
evidence in conducting her analysis.   Instead, she need only reasonably articulate enough that "a
reviewing court [can] trace the path of an [ALJ's] reasoning."   *Id.*

Finally, when a source opines on multiple matters, an ALJ need not explain how she
considered each such opinion.   *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1).   Instead, a single analysis
of all of a source's opinions is permitted, if an ALJ articulates how she made use of the factors
identified above.   *Id.*   This framework guides the Court's review below.

### 2.   The ALJ's rationale for finding Dr. Javier's opinion to not be persuasive is supported by the record.

Dr. Javier opined that plaintiff had a number of restrictions that the ALJ did not include in
the RFC, including needing extra rest breaks in each work day, fifteen days off per month, no more

than three hours of standing or walking in an eight-hour workday, and avoiding pushing and pulling hand or leg controls. R. 21, 1180–82. The ALJ concluded that Dr. Javier's opinion underlying these limitations:

> is not supported by or consistent with the overall medical evidence of record, including diagnostic test results or measurable findings on clinical examinations. In addition, this opinion is not supported by or consistent with the mostly normal findings from physical examinations, including the findings that the claimant retained normal strength and sensation, had normal range of motion over her extremities, had no active joint synovitis, and walked with a normal gait, as described [in] more detail above.

R. 21–22.

The ALJ noted the following medical evidence in reaching these conclusions, including repeated references to normal strength or muscle tone, R. 18–20 (citing R. 445, 450, 455, 461, 470, 472, 771), normal range of motion, *id.* (citing R. 439, 445, 450, 452, 455, 458, 462–63, 466, 472, 720, 728, 752, 764, 770–71, 1310), no active joint synovitis, *id.* (citing R. 439, 452, 458, 462–63, 714, 728, 1310), and normal gait, *id.* (citing R. 445, 450, 455, 472, 770–71). Further, the ALJ discussed plaintiff's physical therapy records from June 2019, noting plaintiff "reported only a little limitation and performing activities including walking several blocks, climbing a flight of stairs, performing postural maneuvers, and lifting or carrying items such as groceries." R. 20 (citing R. 1303). The ALJ also cited the following medical tests, which were largely normal, including an x-ray of plaintiff's skull, R. 18 (citing R. 360), an echocardiogram, *id.* (citing R. 852–53), a neck CT, R. 19 (citing R. 595–96), and x-rays of her hands, *id.* (citing R. 828–29), her left knee, *id.* (citing R. 829–30), her ribs, R. 20 (citing R. 1052), her right shoulder, *id.* (citing R. 1053), her right knee, *id.* (citing R. 1053), and her spine, *id.* (citing R. 1315). Notably, these citations include Dr. Javier's own records, as required for the ALJ to consider supportability. R. 445, 450,

461, 470, 752, 764, 770–72.  The Court has reviewed these citations and finds that the ALJ's summation of them is accurate.

The only exception where the ALJ's summation of the evidence might be considered incomplete, and that was raised by plaintiff, concerns the spinal x-ray.  The ALJ summarized it as "show[ing] degenerative changes with a mild grade 1 retrolisthesis of L3 on L4," R. 20, which matches the impression section of that record, but made no mention of the "severe narrowing of the L5-S1 disc space" or the unremarkable soft tissue findings otherwise listed in the findings.  R. 1315.  However, this summation does not undermine the ALJ's decision, as discussed below.

### 3.    The ALJ did not err in the treatment of Dr. Javier's opinions.

#### a.    The ALJ's logical bridge was sufficient to allow for meaningful review.

Plaintiff's arguments that the ALJ erred are unpersuasive.  Turning to plaintiff's first argument, she criticizes the ALJ for "[m]erely summarizing the evidence in the file," but not stating how it supports his decision, likening this to providing a list of all the ingredients for a cake without any instructions on how to mix them.  Pl.'s Mem. 9–10.

This argument is not persuasive because the ALJ articulated and supported his "logical bridge" between the evidence and his conclusion that Dr. Javier's opinion was not persuasive, R. 21–22, enabling this Court to engage in "meaningful review."  *See Monroe v. Colvin*, 826 F.3d 176, 188–91 (4th Cir. 2016).  Plaintiff's own cited authorities make clear that by "providing a summary of the medical evidence, followed by a summary paragraph illustrating how the ALJ reached her conclusion from that evidence, the ALJ may build the requisite logical bridge."  Pl.'s Mem. 10–11 (citing *Jacob G. o/b/o G.G. v. Berryhill*, No. 7:18-CV-15, 2019 WL 1571286, at *7 (W.D. Va. Feb. 26, 2019), *R. & R. adopted*, No. 7:18-CV-00015, 2019 WL 1290895 (W.D. Va. Mar. 20, 2019)).  This is exactly what happened here.  The ALJ summarized the relevant evidence

on gait and other normal findings, R. 17–22, followed by a paragraph summarizing how he reached his conclusion, by noting that findings in the medical record, including from Dr. Javier's records, were inconsistent with her opinion, R. 21–22 (citing Dr. Javier's records at R. 445, 450, 461, 470, 752, 764, 770–72).

To the extent plaintiff argues that the ALJ insufficiently explained why he found Dr. Javier's opinion not persuasive, the Court finds otherwise. Plaintiff relies on Dr. Javier's claims that objective medical evidence and tests support her conclusions; however, Dr. Javier does not actually identify what that evidence is, beyond referring broadly to "Rheumatology and Ophthalmology notes[,] [l]abs, xrays reviewed (available upon request)." R. 1180. Further, she does not explain at all how this evidence supports her suggested limitations. *Id.* As such, the ALJ was not directed to any specific evidence to review by Dr. Javier, and instead was left to, and did, review the evidence in the record as a whole. R. 17–21. As the ALJ noted, that evidence includes repeated findings of normal gait, strength and sensation, range of movement, and no active joint synovitis, as well as plaintiff reporting only "a little limitation" on walking several blocks or climbing flights of stairs. R. 20. The findings on gait/strength and joint synovitis are, respectively, at least facially inconsistent with Dr. Javier's limitations on walking/standing and polyarthralgia. R. 20, 1181. Therefore, because there is sufficient evidence that "a reasonable mind might accept as adequate to support [the ALJ's] conclusion," the Court finds there is substantial evidence to support the ALJ's determination that these findings are inconsistent with, and do not support, Dr. Javier's opinions on plaintiff's limitations. *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. of N.Y.*, 305 U.S. at 229).

        **b.**    **The ALJ's treatment of the paraspinal musculature and spinal x-ray records did not mischaracterize the evidence or undermine an accurate and logical bridge.**

Plaintiff's next argument is that the ALJ "mischaracterized the objective evidence to support his position" by failing to address plaintiff's limited bending mobility, *see* R. 790, and that failing to address the noted severe narrowing of the L5-S1 disc space meant the logical bridge the ALJ built was not accurate, R. 1315. Pl.'s Mem. 10–11. While it is true that an ALJ can fail to build a logical bridge where the ALJ "failed to accurately address the significant conflicting evidence in her summary and mischaracterized the objective medical evidence," *Jacob G. o/b/o G.G.*, 2019 WL 1571286, at *7, this did not occur here.

        **i.**    **The ALJ accurately addressed the record evidence on plaintiff's paraspinal musculature.**

Plaintiff faults the ALJ for allegedly noting "normal" examinations, despite findings made by Dr. Javier following her examination of plaintiff on December 24, 2018. R. 785–92. Dr. Javier found "[n]o vertebral body tenderness of the thoracic or lumbar spine. Tender along the right paraspinal musculature. Limited bending and side-to-side movement of the trunk." R. 790. Plaintiff argues this is not a normal finding, and that the ALJ therefore erred. Pl.'s Mem. 10.

However, the ALJ accurately stated there was "some tenderness over [plaintiff's] right paraspinal muscles with limited bending and side-to-side movement of her trunk . . . [h]owever, there was no vertebral body tenderness noted over the claimant's thoracic or lumbar area." R. 20 (citing R. 790). Further, plaintiff omits the word "mostly," Pl.'s Mem. 10, from the ALJ's characterization of the findings in the record as normal. R. 22 ("In addition, [Dr. Javier's] opinion is not consistent with the *mostly normal* findings from physical examinations . . . .") (emphasis added).

Given the already noted normal findings regarding plaintiff's strength and sensation, range of motion, gait, and lack of active joint synovitis, *see id.*, the ALJ did not mischaracterize the record evidence based on this one finding on spinal tenderness, especially where he accurately described and cited that same record in his analysis.

### ii.    The ALJ's review of the x-ray records was not inaccurate.

Plaintiff also argues that, by only noting the "mild grade 1 retrolisthesis of L3 on L4" from the "Impression" section and omitting the "severe narrowing of the L5-S1 disc space" finding elsewhere in the x-ray report, the ALJ so severely mischaracterizes the record that he failed to build an accurate and logical bridge. Pl.'s Mem. 10–11 (quoting R. 1315).  In response, the Commissioner argues that the ALJ could reasonably rely on the "Impression" section, rather than the findings, because it is a "concise summation" of the x-ray report, and because an ALJ has no obligation to cite all pieces of evidence, let alone every detailed findings of an x-ray.  *See* Def.'s Mem. 27–28 (citing Wilcox, John R., M.D., *The Written Radiology Report*, at https://appliedradiology.com/articles/the-written-radiology-report (last visited April 29, 2022) (noting that impressions sections are the most read and most important sections summarizing the findings of radiology reports).  Notwithstanding the Commissioner's argument, the ALJ must always build an accurate and logical bridge between the evidence and his conclusions.  *See Monroe*, 826 F.3d at 188–91.  Nevertheless, the Court finds the bridge accurate for three reasons.

First, treatment and physical therapy records mainly show no ill effects from any narrowing.  For example, and as noted by the ALJ, plaintiff's physical therapy records from June 2019 indicate that she only had a little limitation on walking several blocks, climbing a flight of stairs, and performing postural maneuvers, or lifting groceries only a few months before the x-ray. R. 20 (citing R. 1303).  Additionally, the physical therapy records make no specific mention of

any back pain, despite noting either no pain, R. 1243, 1260, 1268, pain in her toe, R. 1264, or pain all over her body ranging from 0 out of 10, at best, to 7 out of 10, at worst, R. 1275, 1282–83, 1287, 1295, 1297, which may have been related to illness and treatment for an abscessed tooth, *see* R. 1282–83.  Further, as the ALJ noted, the record throughout shows that plaintiff had "mostly normal" findings regarding strength and sensation, range of motion, and gait.  R. 22.

Second, the October 16, 2019 treatment records made immediately before the October 16, 2019 x-ray do not indicate any substantial new limitations that would support a finding of mischaracterization of the record.  R. 1307–15.  As the ALJ noted, plaintiff had no acute synovitis, and had a good range of motion over her shoulders and knees bilaterally.  R. 20 (citing R. 1310).  That same page of the record also notes plaintiff complained only of "moderately achy lower back discomfort," despite her generalized pain score of eight out of ten.  R. 1307, 1310.  Further, her rheumatologist's assessment was "Lumbago – without sciatica [,] Garden variety," with yoga and a muscle relaxant suggested as treatment, and with no follow up visit for three months.  R. 1307–08.  These relatively mild, contemporaneous, and back-specific findings support the ALJ's overall conclusion that the x-ray findings were not severe enough to support Dr. Javier's unadopted limitations, such that an omission of one finding was not a mischaracterization of the evidence.

Finally, the ALJ noted that the x-ray findings were not normal, given that he mentioned the "degenerative changes with mild grade 1 retrolisthesis of L3 on L4."  R. 20 (citing R. 1315).  The ALJ's omission of one specific finding from his discussion of the x-ray record does not support the conclusion that he inaccurately suggested that the x-ray findings were normal.  The Court also notes that the ALJ's reference to this record was more specific than Dr. Javier's, who referred to it only as part of the "Rheumatology . . . xrays reviewed (available upon request)."  R. 1180.  Also,

the ALJ noted that "[t]he medical evidence does not include evidence of nerve root compression" and that "lower extremity issues have not resulted in an inability to ambulate effectively." R. 15.

Therefore, after reviewing the record evidence as a whole, the records immediately before the x-ray was taken, and the ALJ's specific treatment of this record, the Court is not convinced the omission of the severe narrowing finding rendered the ALJ's logical bridge inaccurate. The Court need not speculate about why the ALJ did not discuss the severe narrowing finding, because the ALJ focused on the real-world effects of plaintiff's ailments and accurately noted that they did not place plaintiff in any acute distress, limit her range of motion, or cause joint synovitis. R. 20. The ALJ also appropriately considered the contemporaneous positive notes from physical therapy and the mostly normal findings throughout the record to determine that the medical evidence did not support Dr. Javier's proposed additional limitations. R. 20, 22. As such, there is no reason for the Court to conclude that the ALJ's summary was a mischaracterization or that it rendered his logical bridge inaccurate. To the extent the omission of the severe narrowing finding was an oversight, the ALJ set forth an adequate factual basis to conclude that plaintiff exhibited no work preclusive ill-effects from her back condition requiring additional limitations, making the omission harmless.

        c.      **The ALJ adequately addressed the evidence on plaintiff's balance disorder.**

Finally, plaintiff's argument that the ALJ improperly failed to "discuss probative evidence regarding Plaintiff's issues with balance," despite Dr. Javier's notations that plaintiff fell four times in the past year, and the related physical therapy she received, is not persuasive. Pl.'s Mem. 11.

At the outset, the Court notes that, Dr. Javier only opined that plaintiff's limitations were caused by "Polyarthralgias, visual loss," not any balance issues. R. 1180. Further, Dr. Javier never referenced plaintiff's physical therapy records to support her opinions. *Id.* (referring to "Rheumatology and Ophthalmology notes[,] [l]abs, xrays reviewed (available on request))." The

rheumatology and ophthalmology records contain limited, if any, references to plaintiff's balance or gait issues, and plaintiff has not pointed to any such records in her briefing. Pl.'s Mem. 4–5, 11–12 (citing only Dr. Javier's and physical therapy records). Dr. Javier's own notations are limited to the falls plaintiff reported. R. 776, 778, 800. Additionally, Dr. Javier only included a few limitations arguably related to balance issues, which the ALJ adopted into the RFC. *See* R. 16–17, 1180–82 (noting restrictions concerning unprotected heights, moving machinery, driving, and pushing or pulling arm controls at least for the right arm). Further, the ALJ partially adopted other limitations, including an occasional limitation on using leg controls, as opposed to a complete ban, a limitation around wet or slippery conditions, and a four-hour limitation on standing or walking, as opposed to Dr. Javier's three-hour restriction. *Id.* By comparison, the restrictions the ALJ did not adopt are not balance related, such as the limitations on exposure to dust, fumes, and gases, on lifting objects or using fine manipulation, on sitting, and the need for break time or times off due to an inability to concentrate due to pain and fatigue. R. 1180–82. The Court also notes that Dr. Javier's restrictions that plaintiff would not be able to focus for 75 percent of the day, requires an additional hour of rest in an eight-hour workday, and requires 15 days of bedrest in an average month, are much stricter than anything noted in the record and appear unrelated to any balance issues plaintiff may have. *Id.* The Court also agrees with the ALJ that these limitations do not align with plaintiff's conservative treatment history. *See* R. 21.

The foregoing notwithstanding, the ALJ addressed plaintiff's balance disorder and found it and other issues not severe because "[t]he evidence of record does not demonstrate that these conditions cause any significant functional limitations that have lasted or are expected to last 12 months or more." R. 15. By definition, a non-severe impairment "does not significantly limit [a disability applicant's] physical or mental ability to do basic work activities," 20 C.F.R. §§

404.1522(a), 416.922(a), meaning the ALJ thought it did not impact plaintiff's RFC.  R. 15. Nevertheless, the ALJ stated he considered these limitations while assessing plaintiff's RFC.  *Id.*

For evidence of plaintiff's balance disorder, plaintiff cites her falling four times in 2018 as of October 15, 2018.  Pl.'s Mem. 11 (citing R. 778).  Plaintiff also cites physical therapy intake notes indicating some moderate difficulty performing tasks or walking because of vision loss.  *Id.* at 11–12 (citing R. 1241–42).  Additionally, though uncited, plaintiff fell twice more by March 4, 2019, R. 800–01.  Further, her hearing testimony indicates that even after physical therapy she "often" has depth perception issues on stairs, so she likes to be "very, very careful."  R. 60–61.

However, by June 4, 2019, after only a few months of physical therapy, plaintiff stated that her balance had improved and that she had not fallen again, suggesting substantial improvement. R. 809–10.  Further, the physical therapy records state that plaintiff noticed her balance improved as early as May 6, 2019.  R. 1275.  Plaintiff confirmed this improvement two weeks later, noting that she "had a couple near falls but never fell."  R. 1283, 1287.  She also testified at the ALJ hearing that her falling issues had improved since physical therapy.  R. 61.

Although the ALJ did not directly mention a balance disorder when discussing the consistency or supportability of Dr. Javier's opinion, the ALJ did note it in his review of the RFC directly when finding plaintiff's balance issue non-severe, R. 15 (citing R. 472), and indirectly in terms of plaintiff's lack of Romberg signs, R. 18 (citing R. 472), and normal gait, R. 18–20 (citing R. 445, 450, 472, 770–71).  He also referenced the findings from the physical therapy records, noting plaintiff only had a "little" limitation in walking several blocks, climbing a flight of stairs, performing postural maneuvers, and lifting or carrying items such as groceries, which is consistent with significant improvement in plaintiff's balance disorder with treatment.  R. 20.  Such improvement resulted in only "little" limitations and supports the ALJ's conclusion that plaintiff's

balance disorder was non-severe. R. 15, 20 (citing R. 1303).[22] The ALJ incorporated all these findings into his discussion of Dr. Javier's opinion, specifically noting her opinion was not supported or consistent with the findings "described [in] more detail above." R. 18, 22, 1303.

As such, there is sufficient evidence in the record such that a "reasonable mind might accept as adequate to support a conclusion" that plaintiff's balance disorder did not affect her RFC beyond the limitations already included. *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. of N.Y.*, 305 U.S. at 229). Therefore, because the ALJ accurately considered the physical therapy treatment records for plaintiff's balance disorder, as well as the repeated references to plaintiff's normal gait, the Court will not substitute its judgment for that of the ALJ, and finds that his conclusion that Dr. Javier's opinion is not persuasive is supported by substantial evidence.

**B.     The ALJ's step four finding is supported by substantial evidence.**

Plaintiff only challenges the ALJ's treatment of Dr. Javier's opinions, which the Court has found proper and supported by substantial evidence.   Therefore, substantial evidence supported the ALJ's step four finding, based on a hypothetical to the VE that did not include Dr. Javier's suggested absenteeism limitations, that plaintiff had the RFC to perform her past relevant work. *See Davis v. Apfel*, 162 F.3d 1154, No. 97-1719, 1998 WL 559728, at *2 (4th Cir. 1998) (holding an ALJ may offer different hypotheticals and later determine which hypothetical most closely fits the evidence of record for use in the RFC).

## VI.     RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment

---

[22] The Commissioner also argues that plaintiff "reported no limitations walking around a room and walking more than a mile." Def.'s Mem. 29 (citing R. 1303).  The record on walking more than one mile says "Limited A Lot" at intake and has "--" as the status on June 3, 2019. R. 1303. Given plaintiff was "Limited A Little" at walking one block, the Court presumes that "--" indicated no change, meaning plaintiff was still limited a lot from walking more than one mile. *See id.*

(ECF No. 19) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 22) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.       Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.       A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 29, 2022